The United States Court of Appeals for the Federal Circuit is now open and in session. Dr. Salem of the United States and his Honorable Court. Please be seated, ladies and gentlemen. Good morning. We have three cases this morning, consolidated into one. 172312, Dr. Falk v. Milan, et al. 172636, Salem v. Milan. 182097, Valiant v. Milan. And we have a motion to intervene and a motion for disqualification. We are going to grant the motion to intervene and therefore we needn't hear argument on that topic. We understand that Ms. Bork will take 5 minutes, 3 and 2, and leave Mr. Lipsy 15 and 10. And are you both representing the same client? If I may, Your Honor, to some extent, yes. I represent Valiant Pharmaceuticals International Inc. and Salix in what we've been calling the New Jersey action, the 182097 case. Ms. Bork represents Salix and Intervenor VPI in the other two cases. And with the Court's permission, since we think that our entitlement to relief in all three cases is substantially the same, I was going to endeavor during my argument to explain why we were all entitled to relief. And Ms. Bork was going to reserve some time to answer questions that were peculiar to her two cases. So you're going to speak first? With the Court's permission. That'll be fine. And you're going to take a total of 15 minutes? Yes, and reserve 10 for 5. 25. So we'll set this for 25. All right. Mr. Lipsy, please proceed. Okay. Thank you, Your Honor. Our motion for disqualification begins with the fact that Valiant Pharmaceuticals International Inc. and Salix are both current clients of the Catton firm. We believe the engagement agreement, which is Exhibit 5 to the Diner Declaration, is dispositive on the point. It is an agreement by, between, and executed by Valiant Pharmaceuticals International Inc., which is the parent company. It incorporates by reference the outside counsel guidelines that specifically refer to it governing the relationship between VPI and its affiliates and outside counsel. And it offers a list of affiliates to assist in avoiding conflicts. Now, Catton relies on the commentary to Rule 1.7 for a proposition which is true in the abstract, that a party representing a sub doesn't necessarily represent the parent. But when you look at that commentary, specifically Comment 34, it says, unless there is an understanding that the lawyer will avoid conflict with affiliates. And that is exactly what this contract provides. And indeed, ABA Formal Opinion 95390, which we cited, is explicit on the point. Clearly, a corporate affiliate must be treated as a client, whether generally or only for purposes of Rule 1.7, if the lawyer has agreed so to treat it, regardless of whether any actual work has been or is to be performed for the affiliate. Speaking of has been, if we agree with you, Mr. Lipsy, what will be the consequence, if any, on past decisions? The decision from the board and from West Virginia, presumably not from New Jersey, because you won there. But how about the decisions from the other two tribunals? It seems to me that this problem arose while those cases were in this court in May of 2018, and I believe those appeals were docketed in 2017. Unless Ms. Burke is going to hang me by my thumbs and contradict me, I suspect that there is no impact on those decisions from this motion. Those decisions, we think, were wrong for other reasons, which we'll address on the merits. And for prejudice purposes, as I understand it, you disagree with Mylon's concern about the need to rebrief, and you say that there is no need to rebrief. We do not believe there's a need to rebrief. I mean, there's a certain practicality associated with these things, and we are looking for relief going forward. All right. How do you respond to your friend's argument on the other side that says, because they are not a key firm within the OC guidelines, that they're not bound by the loyalty provisions? We think that's an irrational reading of the agreement for this reason. Section 1.2, which deals with conflicts. Paragraph 1 specifically requires a conflict check and offers a list of affiliates to help identify conflicts. The second paragraph, last sentence, specifically requires all firms must follow the ethics rules. Now, that includes Rule 1.7, which requires avoiding concurrent conflicts. Now, the comment six of the ABA comment six to Rule 1.7 makes clear that that does not include economic conflicts, so-called business conflicts, which we've all confronted in law practice where there's no ethical conflict, but it's directly adverse to your client's business relationship. And so the first two sentences of the second paragraph of Section 1.2 deal with that, and they require something more. Something more than adherence to the ethical strictures by so-called key firms that are in the million-dollar-plus-per-year category. And that requires them to avoid any conflict, whether ethical or economic, with any entity or affiliate of the PI, and that's the rational reading of that agreement. So you're saying rather than limit 1.2 to only key firms, that that second paragraph actually expands the obligations of key firms? Of key firms, exactly. It imposes on key firms something more than the pure ethical obligation extending into economic conflicts. Now, frankly, there's a reason why the engagement agreement includes VPI and all its affiliates, and that's because the evidence before this Court has shown that VPI and its affiliates have operational commonality in terms of sharing many key elements of general and administrative work and support, including computer systems, and, most importantly, share a common legal department. And also have financial interdependence with Bausch & Lomb sales representing 57% of Valiant's revenues and Salix's sales representing 20%. And those are circumstances that indicate that these affiliates should be considered a client even absent express agreement, as Comment 34 to ABA Rule 1.7 makes clear, and the GSI case that we've cited makes clear. That's even in the absence of agreement. Let's go back to the agreement under 1.2 in the engagement guidelines, the third paragraph. It seems to define what a significant degree of loyalty is, not necessarily in terms of the money. It goes on and says that such firms should not represent any party, and it goes on and says, of any Valiant entity. And it seems to me that this part right here, any Valiant entity, that the parties were foreseeing this corporate representation or the different organizational forms that can exist, and it's limiting the significant loyalty to not just to the $1 million in billing, but also with respect to a Valiant entity, which seems to me to say that if you're not a key firm, then it's okay to represent affiliates. With respect, Your Honor, I think you're not focusing on the right any in that sentence. The sentence says that they should not represent any party in any matters, any matters, not just ethical conflict matters, where such parties' interests conflict with the interests of any Valiant entity. In other words, it's a blunderbuss limitation on taking on work that's conflicting with the ethical or economic interests of the Valiant enterprise. Well, it's not that big of a scope of a blunderbuss, because it's defining key external firms not only by, well, with respect to any Valiant entity, and I am focusing on that, which seems to imply that if you're not a key firm, then the corporate conflict rules don't apply to you, the affiliate rules. Well, with respect, the suggestion that the last sentence, which says all firms have to apply by the ethical guidelines, which prohibit taking on direct adversity to a current client, to suggest that that is somehow narrowed, that bigger firms have more latitude there than smaller firms is not, we think, a rational reading. And I would again reiterate, the point here is the higher degree of loyalty that's expected here goes to any conflicts, even conflicts that might not be pure ethical conflicts. It only makes sense, reading this, that the obligations of these key firms be broader than the narrower ones, not narrower. One of the Salix motions refers to Valiant Pharmaceuticals, Inc., but there is no such entity, is there? I believe that there may be such an entity as an intermediate subsidiary, and I vaguely recall there being reference to an entity by that name owning certain trademarks, but it itself is a wholly owned subsidiary of Valiant Pharmaceuticals International, Inc. Okay. And I'll invite Ms. Burke, if I have misstated, I'm sure she will correct me. Now, Rule 1.7 required Valiant's informed consent to be waived for the adverse representation. ABA Formal Opinion 96400 that we've cited makes it clear that even if disqualification is only a risk but not a certainty, the hiring firm's client, that's us, is entitled to consultation to obtain informed consent early in the hiring process. Now, they claimed, well, we couldn't. We couldn't ask for consent. And the ABA comment to Rule 1.7 deals with that. Comment 19 says, it may be impossible to obtain consent, and if that's the case, it says the parties have to be separately represented. In other words, the fact that you may not be able to get permission to ask for consent doesn't mean you can go forward. It means you have to stop. Now, what if you did have the engagement letter? What's your argument for a conflict without the engagement letter? As I said, the operational commonality and financial interdependence of the parent with its subs, which had been proven in the Gorman declarations in this case, would, without the agreement, be the circumstances that the rule contemplates as requiring that the affiliate be treated as a client, at least for conflict purposes. So you're essentially saying that these valiant entities do not adhere to the separate corporate forms? I am not saying that, and I don't believe that this standard is equivalent to a piercing the corporate veil standard. I think there is a middle ground here for an interrelationship, which, for ethical purposes, requires that the entities be treated as the same for conflicts purposes. When it is apparent, for example, that they share a common legal department, and on day one, that legal department will have to see the lawyer as giving advice, and on day two, will have to see that law firm as an adversary pounding their head. And that's the sort of thing that those ethical rules are intended to prevent. So, yes, we believe that we meet the limitations in that GSI case that I cited, regardless of whether we have the agreement or not. We think the agreement is absolutely crystal clear. Did the GSI case apply the law of any of the states that are at issue here? It was a Second Circuit case, but we think that the rationale is... And, candidly, there aren't that many of these cases, really, anywhere. And the opinions seem to cite, with approval, analyses done in different districts and different circuits that seem to make sense. And that one seems particularly to make sense. So was the state from which that case arose a state that adopted the model rules? I don't know. I assume so, because I think that they all have in the Second Circuit. I think we have an exhibit in our papers that lists those. We were entitled to be asked for informed consent. We weren't. The Catton, the lateral attorneys, and Mylan all knew of VPI's involvement in these three cases. We're named parties in the New Jersey case. The certificates of interest in this court identify VPI's interest in those cases. The lateral attorneys themselves identified both SAILIX and VPI as adverse parties when disclosing the Dr. Falk and West Virginia cases to Catton. That's in Mr. Berry's Declaration, Paragraph 6. Mylan was aware of the relationship between Bausch & Lomb and VPI. They had just finished two extensive litigations on Bausch & Lomb technology, where they had been represented by the lateral attorneys. One was a Pro Lensa matter that was settled by agreement. That's Diner Exhibit 25. Mylan received a license there from plaintiffs B&L on behalf of themselves and their affiliates. That's in Paragraph 5. Notices were to be sent to both B&L and Valiant in that agreement. And, indeed, notices from Mylan were to be sent to the lateral attorneys. And that is an ongoing agreement between Mylan and B&L and Valiant. And there is in the record the fact that there were direct communications between Dennis Polin of Valiant and Mr. Jenkins of Mylan in connection with that settlement. And that's Diner Exhibit 26. The same is true of the Prieve matter. There was also a settlement there, Diner Exhibit 30, again with a license, again requiring notice to B&L and Valiant. That's on Page 25. Again with notice to the Mylan lateral attorneys. Again, there was direct communication between Dennis Polin of Valiant and Mr. Jenkins of Mylan. That's Diner Exhibit 31, which says the settlement agreement has been signed by Valiant. I mean, Mylan was well aware of the involvement of Valiant in the intellectual property matters of its subsidiaries. We believe that the lateral attorneys had an obligation to inform Mylan of a possible limitation on their ability to continue that representation relating to B&L when they decided to move. And we believe that the assumption should be that they did so and that Mylan also was aware of this situation and aware of the possibility of conflict with the involvement of VPI in the IP matters of its subs. And we think it asks too much from this Court to ask to assume that Mylan was not so informed, particularly when the Jenkins declaration is conspicuously silent about what Mylan knew and when they knew it. Now, the balance of interests we talk about, we think VPI is the only innocent party here. Everybody else knew of the problem or should have known about the problem and went ahead anyway. We know for a fact that Catton calculated the value of the VPI representation. We saw that in the Verity declaration. They were never close to $1 million a year. We know for a fact they calculated the value of the lateral attorney acquisitions. There's a press release, Diner Exhibit 1, expected to generate significant revenue for the firm. And we know they read the engagement agreement that explicitly covered VPI and was signed with VPI and have offered what we contend is an irrational interpretation of it in an effort to justify a headlong dash into the arms of a more lucrative client. There's little or no prejudice to Mylan in the relief we're requesting. Mr. Florence of Parker Poe has indicated he will argue the Dr. Falk IPR. Mr. Florence also filed an entry of appearance in the West Virginia appeal, identifying himself as principal counsel on October 13, 2017. Indeed, as clear from the Bork declaration, he tried the case below. He is perfectly capable of arguing it on appeal without prejudice to Mylan. Our New Jersey action is an appeal from a partial summary judgment on the obviousness issue related to a single claim. The entire evidentiary record on that motion fits in one banker's box, and it's a routine practice. And that involves a different patent, doesn't it? Yes, absolutely. And it's a routine practice in this court for clients who have lost below to retain new appellate counsel. And Mylan in the 15 appeals in the last year, only four of those were with a lateral attorney, three of which are the subject of the motion to disqualify here. They have a stable. They are a frequent participant in proceedings in this court. They have a stable, able appellate advocates who could easily take on and handle that matter. And if there's expense involved, Your Honor, that's between Catton and Mylan. That's something Catton should reimburse Mylan for. It's not a ground for punishing innocent valiant and requiring them to accept basically second-class citizenship with their law firm. But so what is the harm to valiant or any of its affiliates? The harm here is multifaceted. First, there is, in fact, a risk of confidential information contamination. And that comes from several things. Again, the agreement is enlightening here. Section 2.4 says, talks about strategic decisions and litigation. It requires consultation with valiant on strategic decisions, types of pleadings, legal theories, even retention of experts. There's a section 1.6 on litigation settlements that require risk assessment, case evaluation, and client consultation. The LaFave Declaration, paragraph 6 pointed out that Catton, through its long history, has been privy to that sort of information, including the claims review process, litigation strategies, and settlement approaches and strategies. And these ANDA cases are often mating dances headed for settlement. And so... To date, there has been no breach of any type of confidentiality or confidential information. We perhaps are paranoid. But the fact that an ethical wall was proposed, when an ethical wall doesn't solve a Rule 1.7 violation, and was proposed, limited, seemingly irrationally, just to lawyers who had worked for valiant in the last 18 months, concerned us that damage may already have been done, and that that wall was gerrymandered to allow people... It's pretty common. It's pretty common to set up an ethical wall whenever you think there may be a potential violation. Even though there is no violation, I mean, firms often take the highway and bet on the safe side. Well, that would have been true had they set it up when they joined. They didn't. They set it up the day we asked them to withdraw. Mr. Diner spoke to the lateral attorneys on the morning of May 7th, and that is the day the ethical wall was installed. It was installed late. It's only partial, and it is somewhat irrational, and it causes us concern. There's about 17 days that elapsed from the time that Mr. Merkinje moved to Staten from the time that they erected the ethical wall. So that's about a couple weeks. That's true. It is late. I don't quarrel with the fact that there were 17 days. These people had been talking to each other since mid-September of 2017. The wall went up on May 7th. What other prejudice, what other harm is there other than the potential for divulgence or disclosure of confidential information? There is the fundamental harm to the reason we have the rule in the first place. We have these ethical rules to preserve an uncompromising duty of loyalty of lawyers to their clients. And the commentary to Rule 1.7 makes clear that violation of it causes the existing client to feel betrayed. It interferes with the quality of the relationship. It's sufficiently important that it is an ethical requirement. It is important to public trust in the legal profession and to the appropriate presentation of evidence and argument to the courts. And the argument they've made, they basically have said- It seems that the rules, the way they're written, begin with the premise that there is no conflict when you're representing affiliates. That comment goes on to say unless there's an understanding to the contrary and there was a contract here to the contrary. And that ethical opinion that I cited deals explicitly with that. They basically argued, and I see I'm about to eat up the entirety of my rebuttal time. They've argued almost as if the Wyeth case in New Jersey rewrote the rule. So that it said, well, you can represent a client directly adverse as long as that client can't prove that there's material damage to confidential information. That is not what Wyeth did. Even Wyeth and the cases following Wyeth recognize a big factor lost in their analysis is the purposes to be served by the rule and the duty of loyalty and the confidence in the legal system. It is unseemly what happened here. It is easy to avoid. There is an easy remedy without much prejudice to my land that vindicates the rule and makes lawyers follow it. And the cases that follow Wyeth, like the GE case they rely upon so heavily, all look at the nature of the violation. Why haven't you cited to the exceptions under comment 64 to rule 1.7? I'm sorry, which exceptions? Comment 34. What it does, it provides three exceptions to that general rule that I just read to you. Yes. It says that even though, it says unless one of the three exceptions apply. There's three exceptions where if any one of those fits. Okay. Then we're somewhat free to go on and find that representation necessarily represents a conflict of affiliates. The exceptions as I read them in comment 34 are to the ability to represent affiliates. Which include the circumstances are such that they feel it should also be considered a client of the lawyer, which is our argument for operational commonality. There is an understanding between the lawyer and the organizational client that the lawyer will avoid representation adverse to the client's affiliates. That's our contract. And or the lawyer's obligations to either the organizational client of new client are likely to limit materially the lawyer's representation of the other client. We don't need to rely on that one. We only need one. And we've got two. But just to be clear, the, in Wyeth, the movement was in part responsible for the conflict and had no intention of retaining the law firm. We want to retain Catton. The only person at Catton that doesn't like us is Mr. Verdi. We had good relations with the people we were working with. We would like to continue them. Mr. Lipsey, as you've noted, your time has expired. We'll give you two minutes for a bottle later. Ms. Bork, you are about to begin your five minutes, and you apparently want to take three and save two. That's correct, Your Honor. I don't want to repeat what Mr. Lipsey did a fine job of articulating, but just a couple things for the record. In addition to Salix and Valiant, I also represent Dr. Falk Farmer. That's the patent owner in the IPR appeal. In terms of the court's question about the impact on the two appeals, the one from the PTAB and the one from the Northern District of West Virginia, the conflict issue arose after the briefs had been fully briefed and we were waiting for oral argument. So the issue is unique to simply this appeal. I'd like to point out that I think Mr. Lipsey already pointed out there is absolutely no harm to Mylan in this instance because Mylan is represented by another law firm, was throughout the entirety of the IPR proceeding, and the other law firm was the lead counsel in the Northern District of West Virginia action. So they have adequate representation. In fact, Mr. Florence from the Parker Coe firm is designated as the attorney to argue the appeal in the IPR, and there's no reason he can't argue the appeal from the Northern District of West Virginia as he was lead counsel. The only other thing that I'd like to add is we cited one case in our briefs as to the standard in the Fourth Circuit, and it was United States v. Clarkson. It was an old case from 1977. I would just like for the record to bring to the Court's attention a later case that indicates that that standard is still good law, that the Fourth Circuit applies the test from U.S. Clarkson, which is to, in order to prevent the appearance of impropriety, they resolve all doubts in favor of disqualification. And I have a case from the very district judge we were in front of, Judge Keeley, and that is Burgess v. Lester v. Ford Motor Company, 643, Fed Supp, 2nd, 811, and that's from 2008, where she adopted that standard in finding disqualification under the rules of professional conduct in the West Virginia. Kennedy. We'll save the remainder of your time. Thank you. Mr. Verdi, first off, are you representing Catton or Mylan? Mylan. Mylan. But I suppose because I have familiarity with the rules of professional conduct, it made sense I do the argument. Let's hope everybody in the firm has familiarity with the rules of professional conduct. I hope so. Let's start with the letter, the engagement letter, which I think the Court started with, and correctly so. The nature of a relationship between a law firm and a client is contractual in nature, and engagement letters and outside counsel guidelines can make the conflict restrictions either more or less restrictive on the law firm. They can waive conflicts in the future that would otherwise prohibit the law firm from taking, or they can expand and say, for example, you may not be adverse to any of our affiliates, even though Rule 1.7 might make the law firm able to do so. So we have been representing Bausch & Lomb since 2001. I mean, the company's been around since 1853, and so they're a stand-alone company, very well-recognized in the IKEA space, and only been doing trademark and advertising law work for them. They were purchased by Valiant in 2013. Well, it doesn't matter that you're doing one kind of work for one entity and another kind of work for another if, in fact, there is coverage under the letter that says you can't represent affiliates. You could be doing employment law for them, and it would still not matter. Absolutely, Your Honor, it's a contractual matter, and that's why this letter is so centrally important. We had continued to do work for Bausch & Lomb after they were purchased by Valiant in 2013, doing the work with them the way we always had. It wasn't until October 2016 that we received this letter with the outside counsel guidelines. Now, this is fairly common. The bigger companies have more and more recently begun to send out outside counsel guidelines. We get between 100 and 150 of these a year, and we look at them very carefully. Right, that doesn't mean you're not governed by them. No, absolutely, because we are governed by them, that we're not going to take on a representation that puts restrictions on us that we could not tolerate. So, for example, we frequently see outside counsel guidelines that say you agree as a condition of this representation that you will not be adverse to any of our affiliates ever, period, full stop. And we look at those very carefully because, given the circumstances, we may decide that's too heavy a burden for us. It would limit us too much. In the law firm's best interest to where there's any question to get an affirmative letter that says we are not barred from representing any of your affiliates? Well, the outside counsel guidelines that are at the center of this was Valiant's own language. We didn't negotiate it. Valiant imposed it upon us. So two years after they purchased Bausch & Lomb, we got this, and we understood this is not uncommon when you have a large conglomerate that they're going to sort of standardize how legal work is done. And that paragraph that Mr. Lipsy was so dismissive of for us was quite significant. It said that if, unless we were what they defined as a key external firm, then we would default to the normal rules of 1.7. Did you go to them and say this is the way we're reading this? Do we have any dispute over this? No. But you never sought any kind of waiver of potential conflict. No. We didn't view this as waiving conflicts. In other words, the default standard is 1.7, 34, that in the absence of other circumstances, we may be adverse to affiliates of a client. That's the default standard. What this does is it creates a higher degree of loyalty by saying you will be barred from representing being adverse to our affiliates even if Rule 1.7 says you can be, you will be barred for it. But it was very specific. Only if you are a key external firm. Basic contract reading says that means if you're not a key external firm, you're not presumptively barred by this letter. You're still bound by Rule 1.7. We acknowledge that. But that means you're not presumptively barred. So are you saying the first paragraph of 1.2 doesn't apply to all firms? It does. But in order to determine whether there's a conflict or not, in other words, to the extent that we're representing an affiliate of Valiant and we want to be adverse to another affiliate, if we were a key external firm, we'd be contractually barred from doing so and we wouldn't. However, we were never a key external firm, never came close to being a key external firm, and that was an important consideration for us. Well, but the first paragraph says, for convenience in identifying potential conflicts, a listing of affiliated entities is available upon request. And then if you go back up, it says that these guidelines govern the relationship between Valiant, BPI, its subsidiaries and affiliates. Right. So is it your position that there is no reference in this engagement guidelines that indicates that there are restrictions with respect to affiliated entities? No, Your Honor. I think Mr. Lipsy might have misstated our position. Our position is that in the absence of any agreement, the default of 1.7 comma 34 controls. We can be adverse to an affiliate provided there aren't circumstances, one of the three circumstances indicating that they should be treated the existing client and therefore we cannot do it. What this letter purports to do, though, is to say that if you're one of our key external firms, you don't go by rule 1.7. You may not be adverse to any of our affiliates as a condition of you working for us. And frankly, we see that in an awful lot of these, a lot of these outside counsel guidelines, a complete, just a ban. If you work for us, you cannot be adverse to our affiliates. And we made the decision. What's your response to Mr. Lipsy's argument that, in fact, that simply represents a broader obligation? So, for instance, you know, you couldn't possibly represent a generic even if it was an indirect conflict. That's not what the language says. The language is the way you explain why this is different is because under rule 1.7, we're presumptively able, absent of special circumstances, to be adverse to an affiliate. This language says if you're a key external firm, you cannot be, even if you otherwise could be. It says you can't do anything that conflicts with any interest of any affiliate, which would be much broader. But the of any affiliate part is critical because you don't have to be concerned about being adverse an affiliate if you don't trigger one of the other circumstances unless you've contractually agreed to do this. This language is clear. If we were not a key external firm, then we're just bound by the normal restrictions of rule 1.7. Okay, so what's your response to their reliance on GSI? GSI is a very different type of case. GSI in that case, it was a company that was basically operated out of the headquarters of the parent company, Johnson & Johnson. All they did was service the advertising business. It had no stand-alone, no stand-alone. Well, isn't those all the legal entities combined in this case? Well, we don't know, to be blunt. There's 130 subsidiaries. They're not disputing their statement that all of these entities combine their legal representations, which seem to be a critical factor in GSI. We don't know how they have said, a blanket statement, we've combined our legal departments. We do know that the same attorneys that we have been dealing with at Bausch & Lohm since 2001 were the same attorneys we were dealing with after they were purchased. We don't have insight into how they structure or what they mean by having a second. You didn't see any discovery on those? No. No, we didn't. But I will say this, and this is a critical point. Because we get so many outside counsel guidelines that simply say, you may not be adverse to any of our affiliates, and then it's up to us to decide whether that's something we can accept or not. When it said it was only for firms that didn't qualify. Right, but even if the letter didn't govern it, you still have the problem with the other exceptions because of the way these entities are structured and interrelate. Well, these companies, what we do know about Malliant is that they buy existing drug companies. These would come, like, for example,  Whatever Malliant may decide to do about consolidating backroom operations or services, we really don't have any visibility into. But again, you didn't ask for discovery, and you don't have anything to dispute their statements, right? They say on its face that there are overlaps in operations and, critically, overlaps in all the legal operations. So that the lawyer doing work for one entity could be the same lawyer doing the work for another entity or working together with those lawyers. That is a fact. We have to accept that fact because you haven't challenged it. Well, we don't have the ability to challenge it because we don't have discovery and emotion like this. We are just basing it upon the information that's publicly available. But even that question and assume that you say. Did you ever discern a potential for a conflict? Of course we did. We put this into our conflict system. Why didn't you go back to BPI then and seek a waiver? We didn't see it as a conflict, so we didn't seek a waiver. As a matter of fact, it's a very dangerous thing, privately speaking, if you don't believe there's a conflict to ask a client for a waiver because then the client says no, and you still think there's no conflict, you're basically handcuffed by that. Their first argument would be if there was not a conflict, why did they ask for a waiver? We just didn't see this as a conflict. We had never represented Valiant Pharmaceuticals International. They had never come to us and said we have a legal problem, we want a consultation. Same thing with Salix. We had never done any type of legal work for those two entities. The only work we did was for the same company we'd always been representing, Bausch & Lomb. This is really just opportunism. Well, that's not the only work you did. It's only work that's currently being done, but you did a lot of other work for other Valiant entities, right? No. The only other one we did work for was Valiant Pharmaceuticals North America, and that was with regard to their privacy policy on their website, and that representation stopped in January 2016. So when did you set up the ethical wall? It was prior to them receiving the letter from Salix. What happens is because all ethical walls are driven by our computer system, because it's what automatically limits access to documents and information on the system, you have to have a client matter number opened. Right. And so the client, because Mr. Mukherjee came earlier in April, the rest of his team didn't arrive until April 30th. The case was not transferred to CAP until May 1st, and so that's when we opened, that's when the client matter was open. Usually it takes a day or two. There's an intervening weekend in this case because May 7th is a Monday. It usually takes a day or two for the wall to go into effect. You don't have an ethical wall that all you matter. No. Beyond the ones that you believe there may be a potential for a conflict. There was a potential. Well, we wanted to make sure that, well, first of all. This is what I was asking you. You thought there was a potential for a conflict. You said no. We didn't think there was a, well, we understood. But you erected the ethical wall prior to receiving notice from Salix that there was a conflict. Because if there was any chance of confidential information between Bausch and Lomb about Bausch and Lomb being given to the Salix attorneys, we could create a conflict. That is a conflict. You possess confidential information of Bausch and Lomb, and now you're representing another party, and you're concerned that there may be leakage of that confidential information, so you erect the ethical wall. Well, we erected it as a prophylactic measure because the work that we were doing for Bausch and Lomb was only about eye care products and only about trademark and advertising issues. The work for Salix or for Mylan against Salix dealt with patent issues. It's a completely different world than trademark. I don't need to explain that to this court. It's a whole different discipline, different considerations, different specialties, and we were dealing with eye care products for Bausch and Lomb. This case involves gastrointestinal drugs for a completely different subsidiary. We didn't see there was any way we could possibly get information that was useful. The only thing that Valiant has pointed to is they claim that we got confidential information about settlement strategies. If you look at what's actually in the affidavits they submitted, most of the work that we did for Bausch and Lomb was in context of having the National Advertising Division of the Better Business Bureau have sort of a self-policing function. It's not a government entity where they deal with claims of false advertising. That's the bulk of the work we did for Bausch and Lomb. There's no settlement strategies. We're going back to where we were before where you conceded that if there's concurrent representation, it doesn't matter. I mean, you're slicing this really thin. You're saying, okay, this was trademark, not patents, or you're saying it was eye care products, not some other product. I mean, it's very often true that we see trademark and patent, even copyright in one case because they all relate to the same product. I don't understand that effort to slice the salami so thin. Well, but we put up a wall, and we had informed Mr. Mukherjee not to talk about the case, and he submitted an affidavit in this case, which has not been controversial. He never did. So there was no conversation. What I was trying to explain is the reason why the wall appears to have been up late is because we need a client matter number in order to make the wall effective. Otherwise, the computers don't know what bodies of material it needs to exclude other attorneys from. On the prejudice point, I don't understand how the Parker Pro Firm, who was involved in underlying matters and in matters relating to these same patents, is somehow inadequate for purposes of representation. Well, two things. One is that's only in one of the two cases, the West Virginia case, the New Jersey case, this same Mr. Mukherjee and his team were handling the matter. But it's the same patent. No, it's a different case. New Jersey involves a different patent. Yes. As far as the appeal, Mylan had asked Mr. Mukherjee to be involved in the trial and the appeal, shadow counsel over Parker Pro, and had specifically asked him to handle the appeal. So the fact that Mylan is willing to go through this process, I think, itself indicates that they think it's pretty important that Mr. Mukherjee be involved. You're dealing with different patents and even different therapy areas. You're dealing with one legal counsel, and you get a feel for the company's approach to legal issues. Are they inclined to compromise or play hardball? So you're dealing with one law firm, one legal department. Well, that's what they say. That's not what we experienced. We didn't get any particular insight into how they dealt with cases. They said most of the work we were doing was in front of the Better Business Bureau. And so it also is not really applicable to this case. We're talking about arguments on an appeal. So the idea of settlement strategies or any kind of extraneous information, if this is a closed record on appeal, it doesn't really provide any advantage to even have some sort of big success. So you're saying that cases never settle on appeal? Well, he's here to argue the appeal. He worked on the appeal. He's here to argue the appeal. He's here to represent Mylan in connection with all matters at this point related to the appeal, right? Yes. Okay, so you're saying that there would never be settlement discussions during the appellate process? But to the extent that someone was even going to raise that argument, that's why we made sure Mr. Mukherjee never talked to the people doing work for Bausch and Lohman, a wall was set up. Because even though we don't think there's a conflict or there's any useful information, you want to insulate yourself from the accusation that there might have been, and that's why the wall went up. But all of this goes to the issue of whether VPI, Valley Pharmaceuticals, Lancosets, could be considered our client. And we submit we never passed that acid test of ever having them contact us or doing any legal advice to them or contacting us as their attorney. Did they approve your legal bills? We assume so. We were told where to send the legal bills, but we don't really know what happened to the bills after that. But even if Valiant was in charge of reviewing and even paying the legal bills, there's tons of case law, ABA opinions, that the person who pays for a legal bill of a different person is not the client. As a matter of fact, you have to be careful that you don't end into a conflict. That would be more key or more important, given the fact that Valiant was also the legal department in charge of legal affairs that you were handling. Well, actually, we've given possibly visibility into how our trademark practice worked, but it has nothing to do with the new attorneys coming in who are doing patent work. So we just don't see how there was any useful information that could have been traded. But we did set up a wall just in case someone would make that accusation, as they've done here. But all of this goes to the initial threshold question of whether they were our client, whether VPI and Salix were our clients or not. We still maintain that the test of that, you can have an attorney-client relationship without an engagement letter, so the engagement letter is not dispositive. You cannot be a client and pay for somebody's legal bill, so that's not dispositive. The dispositive test is basically the same rules as it is a contract, the meeting of the minds. Did they ever approach us? Did either of these two entities ever approach us and say, we want to consult with you on a legal matter? They didn't. Even Valiant doesn't claim they did, so we had no contact with them as their counsel. Well, the first sentence of the letter talks about the relationship between your firm, Catton, and Valiant. But it doesn't describe any work that we're going to do. This is all about how we're going to bill, what restrictions we have on billing, how we're supposed to set up cases, what kinds of charges we get. What it does do, it says this governs the relationship between Valiant and the firm, and outside counsel. It governs the relationship. Well, but that is for purposes of billing. That's all it is. There's nothing in here that talks about any specific work that we're supposed to be doing. The record indicates your bills were paid by VPI, and that VPI's in-house counsel was in charge of legal affairs for all of the affiliates, for the whole organization. On the first point, if they were paying the bills, that doesn't make them a client. On the second point, if they're legal counsel. No, but it indicates that. I mean, it indicates. Well, there's commentary 13 to rule 1.7 specifically discusses the fact that having someone pay your legal bills doesn't make them the client. If that's the only factor. I mean, this is a, you have to look at, as the cases do, look at all the factors with respect to how the entities are structured. Right. But, because I see my time is running out. Even if, we still maintain that given. Your time isn't running out. Okay. You needn't continue beyond what you have to say, but you have eight and a half minutes. Okay. What this letter said to us is that we would be under the basic rules of 1.7 in dealing with their affiliates, and we did not see, we were not aware of any overlap, any risk of confidential information. Why didn't you question and say, why does it talk about a relationship with BPI when we don't have a relationship with BPI? Because this was the letter we were given. We're not really, these are not negotiable documents. Don't you enter that into your conflict system? It seems like. We did. They would enter Valiant, Valiant Pharmaceuticals. What we entered into the system actually, also we had a specific flag on this case that tied to our billing system, so that if our bills ever close to a million dollars, we'd flag that we were going to have a completely different set of obligations at that point, and would be presumptively not able to be adverse. I don't know if you'd have a completely different set of obligations. You'd have maybe, arguably, a different degree of loyalty, which I'm not sure what that is. I'm not sure what a significant degree of loyalty is, apart from 1.7. Well, the significant degree of loyalty is that we are barred from being adverse to their affiliates, even if 1.7 says we could, as a matter of contract. And we do see this a lot. I need to stress how critical it was that they didn't say, as a condition of working for us, that you will not be adverse to any of our affiliates, period, full stop. Is it really your position that you never either do or can negotiate an engagement letter with your clients? In my experience, given the 100 to 150, we don't get much traction with it. If anything, it's small things about how we store information or how we do bills. But on that basic issue, we see it more and more, especially with larger companies. They're perfectly capable of saying that. And that's really important for us. If they had told us that here, that we take the view you cannot be adverse to our affiliates, period, regardless of what Rule 1.7 may allow you to do, I'm not so sure we would have continued working for Bausch & Lomb. We would then have to basically agree not to be adverse to 130 companies all over the drug market and a company like Valiant, who's continually buying and selling companies. Law firms all the time say we'll represent this affiliate as long as it doesn't apply to any others. Are you saying you never do that? We do, but not in a circumstance where we've gotten outside counsel guidelines. And in this case, I think the only actual reading of this is that we're under 1.7. The only reason we wouldn't be is if we were a key external firm and had billings much larger than we ever had. At that point, it becomes, as a matter of contract, we are not able to be adverse to their affiliates. Remember, adverse doesn't just mean suing them. It also means being adverse in the transaction. And we look at when we have a client who comes in with an outside counsel guideline that says you will not be adverse to our affiliates. We look at that very, very carefully. We take it quite seriously. That's a big deal for us. It may prevent us from operating entirely within certain industries as a result. So the fact that they didn't say that was quite significant to us. This is the key firm provision. It seems to me that it says, well, one way of looking at this is that don't come back to us and ask, if you're a key firm, don't come back to us and ask us for a waiver to be adverse to an affiliate. But yet under 1.7, if you're a regular 1.7 firm, as you argued that you were, then if you're going to represent an affiliate that's adverse, then you should go first and get a waiver. Well, no, that's not what 1.7 says. It's up to the lawyer to determine whether under the circumstances a conflict was created such that the affiliate and the original client should be treated as one and the same. We didn't see anything that indicated we should do that. Well, it says there any conflict of interest that is discovered in the check or that develops can only be approved, so they can be approved or waived or otherwise cleared by written agreement of value in general counsel. So if you're a 1.7 firm, you don't think you're a key firm, you're barred forever. In other words, you can't cure if you're a key firm. But you can cure this if you're a 1.7 firm. You cannot cure it. Well, because we didn't view this as a conflict because of the fact that we didn't see any special That's hard to contemplate that you don't see a conflict or even the potential of a conflict here. You do it enough to erect the ethical wall, but you sign an agreement with Valiant all over it. You're getting your bills from Valiant. Valiant provides in-house counsel, the in-house counsel relationships that your firm is dealing with. And you don't see a conflict? Well, we don't see a conflict because there's nothing in here in which we're actually doing work for Valiant Pharmaceutical International. You signed a deal with them. We signed a deal with them, but again, because they may be paying the bills or reviewing our bills, that doesn't make them the client. They never came to us and asked us for legal representation on any matter. They never consulted with us on legal representation on any matter. There's 130 subsidiaries of Valiant Pharmaceutical Inc. Valiant Pharmaceutical Inc. is in the business of buying and selling companies. They're up in Laval, Quebec. The kind of work that they do has nothing to do with you. I understand that. And again, but it seems to me that you agree that if you were a key firm, you're barred, there's no cure. Yes. And you're arguing I'm a 1.7 firm. The key firm provision doesn't apply. But yet, if you are a 1.7, under the terms of the agreement that you signed, you should have gone and sought a conflict. But you're saying that we never did see a conflict. That's hard to understand. Okay. Well, that was based upon the best information we had. We did ask them when they raised it, is there anything else that you want to tell us that would support the finding of BPI being a client? They didn't respond. They filed a motion. Also, the information that they claim shows that they were all together. We saw for the first time in the pleading. But now I really am almost out of time. I just want to move on to the second part of this. This is all about whether Valiant is a client or not. But under both West Virginia and New Jersey law, even if Valiant is deemed to be a client, that's not the end of the issue. It doesn't mandate automatic disqualification as a result. You have to look at a series of factors. As a matter of fact, both New Jersey and West Virginia are very keen about pointing out that these disqualification motions should be looked at with great skepticism. And that rather than sort of uphold the integrity of the legal profession, can actually work in the opposite, making it look like opportunism. And I believe the word from Wyatt is vexatious tactics should be enough to eliminate a law firm. You basically have to find that there is actual some prejudice here. I'm sorry, to Valiant. So had Mr. Mukherjee and his team not laddled into Canton, right now Valiant would be facing his team, nothing would have changed. The fact that he's at a different law firm doesn't change the facts at all. Only if they could cite actual specific information that he would have obtained that would give him an unfair advantage. And there is none. They cannot cite anything that would give him an unfair advantage. And so in both cases, they say that in the absence of a significant prejudice, the West Virginia case is even a more difficult standard. The quote is, When the conflict is such as clearly to call into question the fair or efficient administration of justice. So you have to actually find something. And usually what this boils down to, is there some specific, generalized theoretical specific confidential information that could have been or actually was given to counsel that would be of relevance to the new case. And they've not cited anything here. And we are unaware of any such information. So even if you decide that somehow VPI and or Salix were clients, that doesn't end the inquiry. I think I'm out of time. Thank you, Mr. Berger. Mr. Lipsy, we're giving you two minutes for rebuttal if you need it. Thank you, Your Honor. I'll try not even to use that. Just on the contract, and I hate to be a dead horse, but the one party that clearly is a client is Valiant, because that's the person the contract's with on the very first page, Valiant Pharmaceuticals International, and they're the ones who signed it. And moreover, under the provisions, we don't have to have something that says, oh, and you won't be adverse to our affiliates, because under the provisions, the affiliates are the clients also. VPI and its affiliates are the clients. And as a matter of logic, if a small provider would be free under 1.7 to be adverse to affiliates, there would be no reason to give that relief to a big provider, which is the way they're reading the agreement. It's an irrational reading. So what do you think the second sentence in the second paragraph of 1.2 means? I think it requires an additional degree of loyalty beyond that required by the ethical rules addressed in the last sentence that includes not bringing actions that are against the economic interests of Valiant Pharmaceuticals, Inc., even if they are not technically ethical conflicts. Give me an example. An example is where you have two companies both selling cholesterol drugs, direct competitors, fiercely competing. And you're representing one in a big-time case, and all of a sudden you decide to take on another to help their direct competitor in a big-time case. And they come to you and say, what are you doing? Don't you realize that those guys are eating our lunch? What on earth are you doing? That's an economic conflict. We worry about those because you can lose the client over those. But they're not ethical conflicts. And the only rational reading of this is that the obligations of the big firm are to give us greater loyalty than the rules actually require. We don't need them to say, oh, we won't represent affiliates. Affiliates are already the client under the terms of the agreement. And then on the question of whether they've done anything for Valiant, there is an email that Mr. Verdi sent to Mr. Gorman on May 11, 2018. It's Diner Declaration, Exhibit 16. And it specifically says, Catton did handle some small matters for Valiant itself between 2015 and 2017. Thank you, Ms. Philipsi. We'll see if Ms. Bork, if she has anything further to say. The court has some questions for me. I don't have anything further to say. Thank you. Well, we've heard Valiant arguments from both sides. And we'll take the motion under advisement. Thank you. All rise. The Honorable Court has adjourned for the day today. Well done, counsel.